# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

01 SEP 21  AM 9: 19

ALABAMA

| | | |
|---|---|---|
| TIM W. GADDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 01-BU-0149-E |
| | ) | |
| CALHOUN COUNTY, CALHOUN COUNTY COMMISSION and LARRY AMERSON, Sheriff of Calhoun County, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ENTERED

SEP 21 200

---

### Memorandum Opinion

---

In his remaining claims in this action, Plaintiff Tim W. Gaddy, as executor of

the estate of Roy Monroe Gaddy, deceased, asserts that Defendants Calhoun County

("County"), the Calhoun County Commission ("Commission"), and Sheriff Larry

Amerson in his individual capacity are liable under 42 U.S.C. § 1983 for violating

Roy Gaddy's Constitutional rights while in pretrial detention at the Calhoun County

jail. Now pending before the Court is Defendants' motion for summary judgment

support of their respective positions on the motion, which is now ripe for decision.

Upon due consideration, the Court concludes that Defendants' motion for summary

judgment is due to be granted, and that Defendants' motion to strike is due to be

denied.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the

parties can bring to bear in order to ascertain whether a genuine need for trial exists.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Summary judgment is weighed heavily in favor of the non-movant; it is appropriate

only if the court concludes that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  A party seeking summary judgment has the initial

responsibility of informing the Court of the grounds for the motion and specifically

identifying those portions of the pleadings, depositions, answers to interrogatories,

admissions on file, and any affidavits that it believes demonstrate the absence of a

genuine issue of material fact. Celotex, 477 U.S. at 323.  Once the moving party has

satisfied its initial burden, the nonmoving party "must make a sufficient showing to

establish the existence of each essential element to that party's case, and on which

that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II. BACKGROUND[1]

On August 25, 1998, the decedent, Roy Gaddy ("Gaddy") was incarcerated in the county jail for Calhoun County on charges of murder. As Gaddy suffered from both high blood pressure and heart disease, he regularly took a prescription medication intended to thin the blood called Coumadin (and generically known as Warfarin). When a patient takes Coumadin, he must regularly have blood tests known as INR/protime tests ("INR tests") so that his blood does not become too thin or too thick. The INR testing is intended to avert the patient's suffering from a thromboembolic event. If the blood were to become too thick it could clot and cause a stroke; if it were to become too thin it could leak through the arteries.

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only." Underwood v. Life Ins. Co. of Georgia, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998) (quoting Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)).

Upon admission to the jail on August 25, 1998, Gaddy had filled out a series of documents including a "Receiving Screening Form" indicating that he suffered from high blood pressure and heart disease, and that he was in possession of nitroglycerin pills.  On August 27, 1998 Gaddy met with Dr. Carla Thomas, a physician who regularly cared for inmates of the jail.  Though the Receiving Screening Form did not reflect the fact that Gaddy took Coumadin, Gaddy communicated this information to Dr. Thomas at this meeting.  As a result of this information, Dr. Thomas ordered an INR test for Gaddy  directly following this meeting, noting the order on Gaddy's Inmate Medical Chart.  The INR test was not performed.  On September 3, 1998 Dr. Thomas again met with Gaddy, ordering an INR test.  The INR test again was not performed.  Dr. Thomas met with Gaddy for a third time on Septmeber 8, 1998 and the issue of Gaddy's anticoagulant medication was neither discussed nor recorded on his medical chart.  Because an INR test is a prerequisite for a Coumadin prescription, and because the INR test was twice requested but never performed, Dr. Thomas believed that Gaddy was no longer taking Coumadin as of their September 16, 1998 appointment.[2]

---

[2]The meaning attributed to Dr. Thomas's failure to prescribe Coumadin after the INR tests were not performed is subject to dispute between the parties.  While it is undisputed that Dr. Thomas never prescribed Coumadin for Gaddy, it is unclear whether  she intended to discontinue any active prescription being taken by Gaddy. Dr. Thomas herself stated that "At this point [August 27, 1998] I stopped the Coumadin," but then answered "I never started it," referring to prescribing Coumadin.

On September 16, 1998 Gaddy posted bond and was released from the Calhoun County jail. On September 18, 1998 Gaddy appeared before the District Court of Calhoun County to enter a plea of not guilty. On that same day Gaddy was readmitted to the Calhoun County jail. Gaddy again filled out a "Receiving Screening Form," but this time indicated that he was taking a "blood thinner" specifically identified by him as "Cumadin" (sic).

The following months passed mostly without incident. On February 16, 1999, the Veteran's Medical Center in Birmingham sent Gaddy a letter scheduling an appointment at the VA's local Anniston clinic. Gaddy apparently forwarded this letter to his son, Plaintiff Tim Gaddy, requesting that he cancel the appointment and also have all future correspondence sent to himself (Tim Gaddy).[3] It is undisputed that Gaddy never made any effort to contact the VA hospital, nor did he ever indicate to any jail personnel that he wished to keep or reschedule the appointment. Plaintiff did communicate to a jail officer at some point during his father's incarceration that

---

Dr. Carla Thomas Depo. at 22-23. The Plaintiffs assert that the jails's medical officers "continued to give Roy Gaddy Coumadin against Dr. Tomas's orders . . . ." Plaintiff's Opposition Brief at 35. The Defendants point out that Dr. Thomas never ordered that Gaddy discontinue taking Coumadin. Defendant's Reply Brief at 2. As will be discussed below, this distinction is moot.

[3]Plaintiff apparently disputes one or more of these facts, as they are referenced in Plaintiff's Opposition Brief in the section entitled "Disputed [Facts]." Plaintiff's Opposition Brief at 5. However, because Plaintiff fails to cite to record evidence which would support such a contention as is mandated by Appendix A, section II(B)(4)(b)(i)(6), such facts will be deemed "admitted."

Gaddy needed to visit the VA hospital.[4] In any event, Gaddy never received an INR test at the VA hospital or anywhere else between his initial incarceration in August of 1998 and his death in May of 1999.

On May 15, 1999, Gaddy informed a jail medical officer that his eye was red, swollen and watery. The officer provided Gaddy with eye rinse and placed Gaddy on the sick call list to see the doctor on Monday, May 17. On Sunday, May 16, 1999, the same officer noticed that Gaddy's eye was still red and swollen, and paged Dr. Thomas at home. Dr. Thomas came to the jail to meet with Gaddy that day, and prescribed an antibiotic cream for Gaddy for which the medical officer placed an order with the pharmacy. The following day, Dr. Thomas again met with Gaddy and diagnosed him with conjunctivitis, directing that he apply the antibiotic cream for five days. On May 23, 1999, Gaddy suffered a fatal stroke. It appears from INR tests conducted at the time of the stroke that Gaddy's blood was critically thin, and that such condition was primarily responsible for his intracranial and interventricular bleeding.

---

[4]Plaintiff contends that he told the jail officer not only that he needed to visit the VA hospital, but that he needed to have his blood tested. In addition, Plaintiff contends that he was told by the officer that Gaddy would not be allowed to see an outside doctor without a court order. Plaintiff's Opposition Brief at 13. Although the Plaintiff references pages 20-29 of Plaintiff's deposition, only page 20 was submitted to the Court. Therefore only those facts that are supported by the record evidence will be considered.

Subsequently, Plaintiff Tim Gaddy filed this action, naming as defendants Calhoun County, the Calhoun County Commission and Amerson in his individual capacity as the sheriff of the County.  Gaddy alleged that Defendants are liable under 42 U.S.C. § 1983 ("Section 1983") for depriving him of his constitutional rights. Plaintiff had also alleged a claim of negligence against Defendant Amerson, but now admits that such a claim can not be maintained due to the doctrine of sovereign immunity.  See Doc. No. 38.  In addition, as the Defendants correctly observe, the Plaintiff failed to state any claim of negligence against Defendants Calhoun County or Calhoun County Commission in his complaint.  See Doc. No. 1.  As a result, such claims are not before this Court.  The Plaintiff's remaining claims are therefore for violations of Section 1983 on the part of Defendant Amerson in his individual capacity, Calhoun County and the Calhoun County Commission.  On August 1, 2001 Defendants Amerson, County and Commission jointly filed the instant motion for summary judgment.

### III. DISCUSSION

A.    Constitutional Analysis

To prevail on his Section 1983 claim against Amerson, Plaintiff must demonstrate both (1) that he was deprived of a right secured under the Constitution and (2) that the deprivation occurred under color of state law.  See Arrington v. Cobb

County, 139 F.3d 865, 872 (11th Cir. 1998). There is no dispute that all the relevant conduct in this case occurred under color of state law. On the issue of whether a constitutional violation can be shown, it is well-established that a jail official violates a pre-trial detainee's Fourteenth Amendment right to due process of law if he acts with "deliberate indifference" to the "serious medical needs" of the detainee.[5] Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997) (citing Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988); Estelle v. Gamble, 429 U.S. 97 (1976)).

The Eleventh Circuit recently elucidated in greater detail the steps of this pavane in Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000). The *Taylor* court stated that "there must be, objectively speaking, conduct by public officials 'sufficiently serious' to constitute . . . 'denying the minimal civilized measure of life's necessities.'" Id. at 1257 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The

---

[5]Roy Gaddy was a pretrial detainee. As such, his Cruel and Unusual Punishment claims sound properly in the Fourteenth Amendment right to due process of law rather than in the Eight Amendment. See Lancaster, 116 F.3d at 1425 n.6 (comparing Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979) (due process violation), with Estelle v. Gamble, 429 U.S. 97, 104 (1976) (Eighth Amendment violation). Nevertheless, Gaddy's claims--that Sheriff Amerson inflicted cruel or unusual punishment on him through deliberate indifference to his serious medical needs–are analyzed in an identical fashion regardless of whether they arise under the Due Process Clause or the Cruel and Unusual Punishment Clause. See id. (citing Hamm v. DeKalb County, 774 F.2d 1567, 1573-74 (11th Cir. 1985)); Belcher v. City of Foley, Alabama, 30 F.3d 1390, 1396 (11th Cir. 1994) (other citations omitted). We thus look to the cases specifying the contours of an Eighth Amendment deliberate indifference claim to determine the elements that Gaddy must satisfy here.

court then imposed a second requirement of "subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." Id. The court further explained that each of these requirements contains two subsidiary requirements. "To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively serious medical need . . .that, if left unattended, 'pos[es] a substantial risk of serious harm.'" Id. at 1258 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994). The second sub-requirement is that "the response made by public officials to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). As to the second prong, a plaintiff must demonstrate that the public official acted with "deliberate indifference." Id. (quoting Estelle, 429 U.S. at 105). "Deliberate indifference" is defined as requiring two separate elements: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and dra[wing of] the inference." Id. (quoting Farmer, 511 U.S. at 837).

The parties have not disputed the fact that Roy Gaddy's heart disease and hypertension created a "serious medical need." However, this Court notes that, under

Eleventh Circuit law, this might not be so.[6]  Because the parties have not raised the

issue in their briefs, the Court will assume that Gaddy suffered a serious deprivation.

In order to constitute an "unnecessary and wanton infliction of pain," the jail

---

[6]In assessing the seriousness of a deprivation, four Circuits, including the Eleventh Circuit, examine the effect of a delay in treatment. See Napier v. Madison County, Kentucky, 238 F.3d 739, 742 (6th Cir. 2001) (noting the approaches of the First, Third and Eleventh Circuits, and adopting the holding of Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1188 (11th Cir. 1994)). Under this approach, the extent to which the deprivation contributed to the ultimate injury at issue is assessed at the outset of the analysis–without a significant contribution, the plaintiff will not be able to establish the predicate Constitutional violation.  The *Hill* court held that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill, 40 F.3d at 188.

In the instant case, Roy Gaddy had his blood tested for the final time on May 11, 1998, having first been incarcerated in the Calhoun County Jail on August 25, 1998.  Therefore, Gaddy missed three of his monthly INR tests even before he was admitted to the jail.  After the jail personnel failed to see to it that Gaddy's blood was tested after Dr. Thomas's two orders of August 27, 1998, and September 3, 1998, more than eight months elapsed before Gaddy died.  During that time, the VA hospital contacted Gaddy in order to set up an appointment.  Although Sheriff Amerson's policy was not to honor appointments for outside medical care arranged by outside parties, it is not disputed that Gaddy would have been allowed to visit the VA hospital at a time designated by the jail.  Gaddy never attempted to schedule an outside appointment for blood work once in the eight months of his incarceration.  Courts have consistently found that some minimal level of vigilance on the part of the inmate is a prerequisite for maintaining a claim for unconstitutional deprivation of medical treatment. See, e.g., Wynn v. Southward, 251 F.3d 588 (7th Cir. 2001) (finding adequate support for plaintiff's Eighth Amendment claims where inmate repeatedly told prison officials that he immediately needed his heart medication, that his pleas were ignored, and then filed two written requests for his medication which were similarly ignored, and finally informed officials that his heart had been fluttering due to the lapse in medication and that he risked heavy chest pains if he did not resume his medication).  In this circuit, a plaintiff who has suffered a discrete deprivation and has not acted to protect his own interests will be found not to have suffered from a "serious medical need" and the claim will proceed no further.

Gaddy has not introduced sufficient medical evidence to establish the extent to which the temporally discrete deprivation suffered contributed to Roy Gaddy's death.  Plaintiff would therefore not have been able to satisfy the objective inquiry of the Constitutional analysis  relating to the "seriousness" of the deprivation.  As the parties have not argued this point, the Court will assume that Gaddy suffered from a "serious medical need."

officials' care must be shown to have been so poor that it fell below a standard of mere negligence. See, e.g., Mandel v. Doe, 888 F.2d 783, 787 (11th Cir. 1989); Flowers v. Bennett, 135 F. Supp.2d 1150, 1155 (N.D. Ala. 2000) (citing Farmer v. Brennan, 511 U.S. 825 834 (1994)). In the instant case, it seems that the level of medical care provided by the Calhoun County Jail medical officers fell below such a standard. The Defendants argue that medical officers performed their duties competently because they distributed Gaddy's medication pursuant to orders given by Gaddy's physician at the VA hospital. This conclusion misconstrues the nature of the issue. Within the span of one week, Dr. Thomas twice ordered that Gaddy be given an INR test and twice her orders were ignored by the medical officers. When a physician orders a vital test twice and the test is never administered, the omission can be said to be more culpable than a "mere accident." Cf., Goodman v. Wagner, 553 F. Supp. 255 (E.D. Pa. 1982) (pre-trial detainee stated claim under section 1983 where defendant jail officials ignored repeated orders of physicians who had prescribed medicine for the inmate). Second, the Defendants' argument assumes that the medical officers are required to follow both the orders of Dr. Thomas and of patients' outside physicians. However, Dr. Thomas testified that her authorization is required for the dispensation of medication regardless of other extant physician authorizations. Therefore, the medical officers were not free to honor the VA

hospital's Coumadin prescriptions.

Whatever the efficacy of the Calhoun County Jail's medical care procedures, in these instances the attending medical officers failed to follow even these minimal guidelines. Where jail medical staff do not perform tests or follow through with treatment ordered by physicians, courts have often found that such omissions are more than merely negligent. See, e.g., Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999) (holding that allegations that jail medical staff ignored accepted and recommended medical protocol reflected more than a mere "disagreement' with the medical treatment received); Miller v. Schoenen, 75 F.3d 1305 (8th Cir. 1996) (triable Eighth Amendment claim established where prison did not follow mandatory follow-up procedures for inmate who had undergone surgery). The Court finds that the officials' response was likely an "unnecessary and wanton infliction of pain" and therefore the Plaintiff has presented ample evidence of a sufficiently serious deprivation.

The Plaintiff has also created issues of material fact with respect to whether the jail medical officers responded to his serious medical need with deliberate indifference. Dr. Thomas placed her order for the INR test on Gaddy's Inmate Medical Chart Form. She testified that her expectation that the test had been performed was based on the fact that one of the two medical officers had initialed

next to the order. In addition, Plaintiff told an unspecified official at the jail that his

father needed a blood test. If this were true, it would mean that at least one jail officer

had actual knowledge of Gaddy's medical needs, and should have drawn an

inference. These appear to be facts from which an inference of the potential for

serious harm could have been drawn. Whether such an inference was drawn in fact

is a tougher question. However, the Plaintiff has provided enough evidence to create

a genuine issue of material fact as to this point. For summary judgment purposes, the

Court will assume that the evidence, viewed in the light most favorable to Plaintiff,

reasonably indicates that one or more officials at the jail acted with deliberate

indifference to his serious medical needs, and thus committed a due process violation.


B.    Section 1983 Claim Against Sheriff Amerson in his Individual Capacity

Even if Gaddy's constitutional rights were violated by one or more Calhoun

County Jail officials, it does not necessarily follow that Amerson can be held liable

under Section 1983. A supervisor, like a municipality, can not be held liable under

a respondeat superior or vicarious liability theory. Hartley v. Parnell, 193 F.3d 1263,

1269 (11th Cir. 1999) (citing Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir.

1994) (citation and quotation omitted)). Supervisory liability is distinct from the

related concept of municipal liability for failure to supervise. Supervisory liability runs

against the individual–it can be imposed without a determination of municipal liability, and does not require any proof of official policy or custom as the "moving force" behind the conduct. "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987). However, in the Eleventh Circuit the analytical framework developed by the Supreme Court in City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) for determining municipal liability is also used for determining the requisite culpability for a finding of supervisory liability. Greason v. Kemp, 891 F.2d 829, 837 (11th Cir. 1990) (holding that supervisors are "quasi-policymakers" and can therefore be held liable for deficient training or supervision if a deliberate indifference standard is satisfied).

The Eleventh Circuit recently limned the proper inquiry in determining the existence of supervisory liability:

> Supervisory liability [under Section 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated

occurrences.

Hartley, 193 F.3d at 1269 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). "In addition, the causal connection may be established and supervisory liability imposed where the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" Id. (citing Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (citation omitted)); see also Ancata v. Prison Health Services, Inc., 769 F.2d 700, 706 (11th Cir. 1985) (same). Finally, a plaintiff might establish the causal connection by showing that, with deliberate indifference to the constitutional right of inmates to receive adequate care for serious medical needs, a supervisor failed to train adequately his subordinates and that such failure caused the deprivation by a subordinate. Adams v. Poag, 61 F.3d 1537, 1544-45 (11th Cir. 1995); Greason v. Kemp, 891 F.2d 829, 836-37 (11th Cir. 1990).

Here, Amerson did not participate directly in Roy Gaddy's medical care during his incarceration. In addition, there is no evidence of any prior failure of the Calhoun County Jail to treat inmates adequately that might have put Amerson on notice that future inmates might encounter the sort of omissions that Roy Gaddy faced.[7] Also,

_____

[7]The Plaintiff failed to submit timely any evidence on this score, acknowledging as much in their Opposition Brief: "[T]he Plaintiff cannot presently show a pattern or practice of the failure of the jail to transport inmates of (sic) INR/Protime tests . . .." See Doc. No. 37 at 31. As set out in the scheduling order, the Plaintiff was to submit all evidence within three weeks of the Defendant's motion for summary judgment. The Plaintiff now attempts to introduce new evidence purportedly showing a tradition of inadequate medical care at the jail via a motion in response to

there is no evidence that Amerson established an affirmative policy or custom that directed jail officials to deny inmates required medical testing. The essence of the Plaintiff's claim is that Amerson did not adequately train his staff regarding their inmate medical care duties, arguing that he was, at the least, under an obligation to reduce such duties to writing. The Plaintiff argues that this failure to train caused jail officials unlawfully to deprive Gaddy of adequate medical care.

That the Plaintiff is cognizant of the very high legal hurdle he must overcome on this claim is evident from his characterization of Amerson's policy at the jail amounting to "no policy at all." It would seem that the system and procedures for medical care at the Calhoun County Jail are somewhat inefficient and confusing. However, a jail's utilization of less than optimal procedures is not actionable under Section 1983. Tittle v. Jefferson County Com'n, 966 F.2d 606, 611 (11th Cir. 1992).

There is no question that, per the procedure instituted by Amerson, Roy Gaddy was asked upon commitment to the jail about his medical history, current medical conditions, and about any prescription medication he was taking. It is also undisputed that the jail provides a doctor for inmates on a scheduled basis twice a week, and for emergency care 24-hours per day, seven days per week. The Plaintiff implicitly

---

Defendant's reply. The Plaintiff avers no exigency that would call for a departure from the filing schedule. Accordingly, the Plaintiff's motion for leave to respond, and the attached response, are both denied.

concedes that these resources are not illusory, in that Gaddy himself saw Dr. Thomas three times within his first two weeks of incarceration, and was seen by Dr. Thomas after she was contacted on a Sunday when an officer observed that Gaddy's eye was inflamed in May, 1999. The jail maintains forms entitled "Non-Emergency Special Medical Procedures" that appear to catalogue inmate care outside of the jail.[8]  For every inmate the jail maintains an "Inmate Medical Chart" listing inmates' medication regimens and treatment of their medical conditions. The jail medical officers also are responsible for dispensing medication to inmates, and records of this are kept in a "Prescription Medication Log." There is also an undisputed policy that inmates may see outside medical care providers of their own choosing, qualified only by the fact that the jail be allowed to schedule the time of such appointment due to security concerns. Such outside tests or appointments are recorded on a calendar in the jail's medical office.[9]

---

[8]The Plaintiffs point out that the Calhoun County Jail failed to complete such a form for Gaddy during the duration of his incarceration. The Court hazards that this is a result of the fact that Gaddy did not receive any treatment outside of the jail during his incarceration. In any event, if the completion of such forms was in fact the policy of the jail but jail officials failed to follow it, there is no basis upon which to hold the policymaker, in this case Amerson, liable under Section 1983 in the absence of evidence that officers had previously misused or shirked the strictures of the policy. See Owens v. City of Atlanta, 780 F.2d 1564, 1568 (11th Cir. 1986).

[9]The Plaintiff posits that such a calendar was "not maintained." If by that Plaintiff means that the calendar and the policy exist, but jail officials do not record outside appointment data on it, that alone is not a basis for holding Amerson liable under Section 1983. See supra, note 8.

Finally, jail officers undergo formal training, including an eighty-hour jail management course, a forty-hour correspondence course through the National Sheriffs' Institute, and a forty-hour First Responder course devoted exclusively to medical training. The Calhoun County Jail also applied for and received a grant from the National Institute of Corrections to develop an additional forty-hour training program for all jail personnel that includes supplemental medical training focusing on the specific needs of the Calhoun County Jail.

The Plaintiff has pointed to several flaws in the jail's medical care procedures. There appears to be a general misunderstanding as to the specific division of medical labor between the doctor and the rotating corps of medical officers. This understanding is particularly acute with respect to the oversight of outside medical care and the procurement of outside medical records. In addition, the Plaintiff notes that the "Prescription Medication Log" is only placed together with an inmate's medical chart after it is full–a delay that could take months. It is likely that there will be times when a patient is receiving medication, and that such information is recorded on the Prescription Medication Log, yet there is no record of the medication on the patient's medical chart. As the doctor reviews only the inmate's medical chart, she will be unaware of the inmate's current medication regimen. Such appears to have been the scenario with Roy Gaddy. However, even though Amerson's policies may not

facilitate an ideal medical care system, the evidence adduced does not establish a system inefficacious to the extent required for Section 1983 liability to attach. Cf. Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985) (holding that medical treatment that is so cursory as to amount to no treatment at all may constitute deliberate indifference).   Compare with Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995) (finding an Eighth Amendment violation where prison officials were systematically indifferent to inmates' medical needs through chronic understaffing and unreasonable delays in treatment).  The Court finds that the evidence submitted is insufficient to indicate that Amerson's policies with respect to medical care and medical training were objectively deficient.

As previously indicated, Gaddy's claim that Amerson failed to train properly and supervise employees to ensure that inmates received adequate medical testing is cognizable only if those omissions reflect "deliberate indifference"on Amerson's part to the constitutional right of inmates to receive adequate medical care.  See, e.g., Young v. City of Augusta, Ga., 59 F.3d 1160, 1171 (11th Cir. 1995); Adams, 61 F.3d at 1544-45; Greason, 891 F.2d at 836-37; City of Canton, 489 U.S. at 389-90.  Such "deliberate indifference" in the context of a claim that a policymaker is liable under Section 1983 means that the policymaker had "actual or constructive notice that the particular omission is substantially certain to result in the violation of constitutional

rights," Young, 59 F.3d at 1172 (quoting City of Canton, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part), and yet "made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). This flavor of deliberate indifference may be demonstrated in one of two ways.

Most often, the need for more or better training or supervision is shown by the existence of a pattern of constitutional violations or prior abuse such that the policymaker knows or should have known that corrective measures are needed. See, e.g., Young, 59 F.3d at 1172-73; Anderson v. City of Atlanta, 778 F.2d 678, 686 (11th Cir. 1985). As discussed above, such is not the case here. Cases from this circuit show that, generally, where no similar incidents are indicated to have occurred, the evidence is considered insufficient to establish that the policymaker acted with deliberate indifference. See, e.g., Gold, 151 F.3d at 1351; Adams, 61 F.3d at 1545; Church v. City of Huntsville, 30 F.3d 1332 (11th Cir. 1994); Wright v. Sheppard, 919 F.2d 665 (11th Cir. 1990); Popham v. City of Talledega, 908 F.2d 1561, 1564-65 (11th Cir. 1990). But see, Vineyard v. County of Murray, Ga., 990 F.2d 1207 (11th Cir. 1993).

There may be limited circumstances where deliberate indifference is shown even without evidence of prior incidents. In City of Canton, the Supreme Court recognized in dictum that "it may happen that in light of the duties assigned to specific officers or employees" the need to train or supervise in a particular area may be so obvious that

liability attaches for a single incident. 489 U.S. at 390; see also, Gold, 151 F.3d at 1351-52. As an example, the Supreme Court offered that it would be obvious that police officers would have to be trained as to the constitutional limitations on the use of deadly force, when a city provides the officers with firearms and knows "to a moral certainty" that its officers will be required to arrest fleeing felons. Id. at 390 n.10. Subsequently, however, in Board of County Commissioners of Bryan County, Okla. v. Brown, 520 U.S. 397, 409 (1997), the Court cautioned that this example is "simply hypothesiz[ing] that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."

Gaddy suggests that Amerson was deliberately indifferent under this theory as well, although he does so without explaining why. In any event, the Court notes that this narrow alternative route to proving deliberate indifference on the part of a supervisor is not applicable to the instant case. Given the general protections that were clearly in place at the Calhoun County Jail for the medical needs of inmates, it cannot be said that it was so patently obvious that Amerson's omissions (assuming there were any) would necessarily result in constitutional injury. See City of Canton, 489 U.S. at 392 (noting that the evidence, as presented, contained sufficient indicia of deliberate indifference on the part of the defendant city in allegedly failing adequately to train its

police officers to recognize when to summon medical care for an injured pretrial

detainee, where there was no evidence of similar incidents and the record indicated that

the city trained its officers on first-aid instruction); Young, 59 F.3d at 1171-72 (finding

no obvious need to train jail employees 'to recognize the need to remove a mentally

ill inmate to a hospital or to dispense medication as prescribed").

The Court finds that the Plaintiff has failed to offer evidence sufficient to raise

a genuine issue of material fact that Amerson failed adequately to train his staff, or that

any deficiencies that did exist were motivated by deliberate indifference. Accordingly,

the Court concludes that Defendants' motion for summary judgment is due to be

granted on this ground.[10]

C.    Section 1983 Claims Against Calhoun County and the Calhoun County
      Commission

In Alabama, in the absence of a grant of authority over the jails from the state

legislature to the counties, counties have no authority over or responsibility for the

_____

[10]The Court also notes that Amerson argues that he is entitled to qualified immunity. The
Court agrees that the evidence in this case is sufficient to grant Amerson's motion for summary
judgment on this ground as well.  Plaintiff fails to show that qualified immunity does not protect
Amerson with regard to his alleged failure to promulgate more rigid procedures or institute
additional training.  See Belcher v. City of Foley, Al., 30 F.3d 1390, 1397-98 (11th Cir.1994)
(finding that it was not clearly established that defendant police chief's failure to develop procedures
to guide subordinates in identifying inmates' suicidal tendencies was unconstitutional). In any event,
given its conclusion that Amerson did not personally violate Gaddy's constitutional rights and
cannot be held liable for any violation that might have been committed by his subordinates, the
Court deems it unnecessary to discuss this argument further.

operation of the jails. Turquitt v. Jefferson County, 137 F.3d 1285, 1291 (11th Cir. 1998). The counties' responsibilities for the jails are enumerated by statute and are limited to maintaining the jail's physical plant and providing operational funding. Id. at 1290-91. The Plaintiff argues that the county is somehow "on the hook" in the instant action for violations that may have been committed by jail officials carrying out jail procedures because it was Calhoun County that had entered into a contract hiring Dr. Thomas. The Plaintiff essentially argues that the County has wrested control over the daily operations of the jail by entering into this contract and now can be held liable under Section 1983 for constitutional violations resulting from jail procedure or policy.

The fact that the County entered into a contract retaining Dr. Thomas in no way implicates a transfer of control over the daily operations of the jail. It is simply an instance of the County performing its statutory duty to provide funding to the jail. Moreover, the Plaintiff has not even alleged that Dr. Thomas violated any constitutional right of Gaddy's. Even if it were true that the County were a "policymaker" with respect to Dr. Thomas's duties, and could be held liable under Section 1983 by a failure to supervise theory, the County still could not be held liable for constitutional violations committed by other jail staff under the exclusive control of Amerson. The Plaintiff fails to raise a genuine issue of material fact as to the County or the Commission's liability under Section 1983. For these reasons, the Court

concludes that Defendants' motion for summary judgment is due to granted on this ground as well.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, the Court concludes that Defendants' motion for summary judgment (Doc. No. 34), is due to be GRANTED. Further, pursuant to the stipulation in Gaddy's Opposition Brief (Doc. No. 38) that Plaintiff's claim of negligence against Amerson cannot be maintained, said claim is due to be DISMISSED.   Finally, Defendant's motion to strike (Doc. No. 42) is due to be DENIED.

DONE and ORDERED this 20 day of September, 2001.


H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE